AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California ▼

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Twitter, Inc., 1355 Market Street, Suite 900, San<br>Francisco, CA, Twitter username "@mateotaylor7" | Case No. '22 MJ01414 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the     **NORTHERN**     District of     **CALIFORNIA**     , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1119, 1111 | FOREIGN MURDER OF U.S. NATIONALS |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA JOSEPH P. HAMER, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____**TELEPHONE**_____ *(specify reliable electronic means).*

Date:   4/19/2022

*Judge's signature*

City and state:  SAN DIEGO, CA        MITCHELL D. DEMBIN, U.S. MAGISTRATE JUDGE

*Printed name and title*

## AFFIDAVIT

I, Joseph P. Hamer, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 1, 2016.  As a federal agent, I am empowered by United States law to conduct investigations regarding, and make arrests for, offenses enumerated in Title 18 of the United States Code. During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, executed search and arrest warrants, and seized evidence of federal criminal violations.  Since April 1, 2019, I have been assigned to work violent crimes against children at the FBI's Ventura Resident Agency.  In this role, I am responsible for, among other things, enforcing federal criminal statutes involving the sexual exploitation of children.  I have received both formal and informal training from the FBI regarding computer-related investigations and computer technology.  My formal law enforcement training includes 21 weeks of education at the FBI Academy, where I took classes on writing affidavits and providing evidentiary testimony, among other topics.  Prior to my assignment at the Ventura Resident Agency, I was assigned to the Los Angeles Violent Crime Task Force.  As a member of this task force, I investigated various violent crimes, including bank robbery, extortion, kidnapping, and homicide.

2.   This affidavit supports an application by the United

States of America for a search warrant for Twitter, Inc.
("Twitter"), an Internet Service Provider headquartered at 1355
Market Street, Suite 900, San Francisco, California ("Twitter"),
to search the following online account:

  a.     Twitter username "@mateotaylor7" ("SUBJECT
ACCOUNT"), a personal account used by Matthew Coleman ("M.
COLEMAN"), as described in Attachment A,
for content and data from February 2019 (when the account was
created) to August 10, 2021, for items that constitute evidence
of violations of federal criminal law, namely, Title 18, United
States Code, Sections 1119 and 1111: Foreign Murder of United
States Nationals (the "SUBJECT OFFENSE") as described in
Attachment B.  On September 8, 2021, a federal grand jury in the
Southern District of California indicted M. COLEMAN for two
counts of the SUBJECT OFFENSE.

  3.   The facts set forth in this affidavit are based on my
own personal knowledge, knowledge obtained from other
individuals during my participation in this investigation,
including other law enforcement officers, interviews of
witnesses, my review of documents and computer records related
to this investigation, communications with others who have
personal knowledge of the events and circumstances described
herein, and information gained through my training and
experience.  Because this affidavit is submitted for the limited
purpose of establishing probable cause in support of the
application for a search warrant, it does not set forth every
fact that I or others have learned during this investigation.

## II. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    A.C. Reported M. COLEMAN Missing.**

4.    On August 9, 2021, Sgt. Larson of the Santa Barbara Police Department ("SBPD") contacted FBI SA Jennifer Bannon regarding a possible parental kidnapping.  Sgt. Larson provided SA Bannon with a copy of a missing person police report that was taken by the SBPD.  I reviewed the police report and learned the following:

a.    On August 7, 2021, SBPD Officer Barriga spoke to A.C. via telephone regarding her husband, M. COLEMAN.  A.C. reported to SBPD that she, M. COLEMAN, and their two children, R.C. (10 months old) and K.C. (two years old),[1] planned to go on a camping trip.  Instead, A.C. said that M. COLEMAN had left their home in Santa Barbara, California (the "Coleman Residence") in the family's Mercedes Sprinter van with R.C. and K.C.  A.C. reported that M. COLEMAN did not tell her where he was going and was not answering her text messages. The officer attempted to contact M. COLEMAN via telephone but received no response.

b.    On August 8, 2021, A.C. called SBPD to follow up on the previous day's report.  SBPD Officer Michael Chung responded to the Coleman Residence and met with A.C., who requested SBPD's assistance in reporting M. COLEMAN and their two children missing.  Officer Chung asked A.C. whether she

---

[1] According to R.C.'s birth certificate, she was born in September 2020.  According to K.C.'s birth certificate, he was born in October 2018.  Both were born in the United States and were U.S. citizens.

could attempt to use the "Find My iPhone" application to locate
M. COLEMAN's phone.  A.C. agreed and turned on a laptop, which
showed that M. COLEMAN's last known location was in Rosarito,
Baja California, Mexico at approximately 2:24 p.m.

**B.  M. COLEMAN Is Located Returning from Mexico and R.C.'s and K.C.'s Bodies Are Found.**

5.  On August 9, 2021, at about 11:50 a.m., Sgt. Larson,
SBPD Detective Davis, and District Attorney Investigator (DAI)
Aijian, went to the Coleman Residence where they met A.C.'s
friends, T.C. and A.P., who explained that A.C. had just left
for San Diego.  T.C. and A.P. showed how they were using the
Find My iPhone app on a MacBook Pro computer (the "MacBook") to
track M. COLEMAN's iPhone movements in Mexico toward the San
Ysidro Port of Entry ("SYPOE").[2]

6.  A.P. and T.C. asked for help coordinating the search
for M. COLEMAN, R.C., and K.C.  A.P. and T.C. showed Det. Davis
and DAI Ajian a text message from M. COLEMAN's iCloud account on
the MacBook.  The text message from M. COLEMAN to A.C. was sent
on August 9, at 3:12 a.m., stating: "Hi babe, miss you too.
Things have been rough but starting to get some clarity as well.
Still confused on a lot of things though and processing through
them. So many crazy thoughts going through my head right now,
hard to explain. Yeah, funny your getting some clarity through

_____

[2] According to Det. Davis's report, A.P. identified the
MacBook as belonging to M. COLEMAN and said A.C. was able to log
in because she had his password.  Later, A.P. provided the FBI
with text messages between her and A.C.  These text messages,
which were on August 9 between about 1:23 p.m. and 2:33 p.m.,
show A.C. providing A.P. with M. COLEMAN's iCloud login and
password, and A.C. asking for "any updates on Matt's location"
with A.P. responding, "It looks like he is at the border."

my grandmas old bibles. Wasn't there 2? Anyways, was actually still thinking of burning them in case theres a chip in them or something. Going to keep processing through everything and hope to get some answers. Hope all this craziness ends soon. Love you."

7.     A.P. and T.C. also showed Det. Davis and DAI Aijian responsive text messages from A.C. to M. COLEMAN asking if her children were okay, as well as a message from A.C. to M. COLEMAN on August 9 at 9:24 a.m., stating: "We are doing this together babe.  Praying for clarity over you and your mind this morning. Everything you've believed and known to be true is happening right now.  I'm partnering with you from SB.  Let's take back our city.  The gateway of revival for the state of California and the nation and the world.  You were created to change the course of world history.  Take care of my little giant slayer and my the voice of heaven's dove.  They sure are special."

8.     Sgt. Larson thereafter seized the MacBook, and law enforcement obtained search warrants for the MacBook.

9.     At approximately 1:00 p.m., on August 9, M. COLEMAN arrived at the SYPOE in the Mercedes Sprinter van.  M. COLEMAN was referred to Secondary Inspection.  There were no other occupants in the Mercedes Sprinter van.  Federal agents took custody of the Mercedes Sprinter van.  That same day, a Mexican liaison partner with the Secretaria de Seguridad Publica Municipal de Rosarito relayed to FBI Supervisory Special Agent Joyce Deniz that they had located two deceased children matching R.C.'s and K.C.'s descriptions in a ditch at approximately 8:00

a.m. on August 9.

**C.   M. COLEMAN Is Interviewed at the SYPOE and Discusses, Among Other Things, Twitter.**

10.   Later that day, M. COLEMAN was interviewed by FBI SA Nathaniel Dingle, during which time SA Dingle read M. COLEMAN his Miranda rights and M. COLEMAN waived his rights and agreed to speak with agents.  I reviewed the video recorded interview during which time M. COLEMAN made, among others, the following statements:

a.   M. COLEMAN confessed to killing his children, R.C. and K.C.  M. COLEMAN said that he drove his children to Mexico on Saturday, August 7, 2021.  M. COLEMAN said that he believed his children were going to grow into monsters so he had to kill them.  At approximately 5:00 a.m., on August 9, M. COLEMAN drove south on Descanso Road.  He pulled off to the side of a road in the area of Rancho Del Cielo.  M. COLEMAN stated that first he killed R.C., using a spear fishing gun that pierced R.C. in the heart.  After he killed his children, M. COLEMAN said that he moved their bodies approximately 30 yards away and placed them in some brush.[3]  M. COLEMAN stated that he drove a couple of miles where he then discarded the spear fishing gun and bloody clothes near a creek.  He threw bloody clothes into a blue trash bin somewhere off the side of a road in Tijuana, Mexico.

---

[3] M. COLEMAN provided agents with the approximate location of the bodies, which coincided with where the bodies were located by Mexican authorities.

b.    M. COLEMAN said that five or six days ago he started noticing strange coincidences.  He discussed QAnon[4] and Illuminati conspiracy theories as well as Strong's numbers (an index of every word in the Bible).  He said visions and signs revealed that his wife, A.C., possessed serpent DNA (M. COLEMAN mentioned that he was not sure if his wife was a shape shifter) and had passed it onto his children and that all things were pointing to the idea that his children have corrupted DNA that will spread if something is not done about it.  M. COLEMAN explained that he was either crazy or the only person that is left on Earth that is a true man, and that while he was in Mexico – before killing his children – M. COLEMAN laid in bed seeing all the pieces being decoded like "The Matrix," and he was Neo.[5]  M. COLEMAN also discussed time travel, teleportation, R.C. and K.C. telling him about babies being placed in fireworks, food, and walls.  M. COLEMAN explained that his children were communicating with him; that K.C. told him that A.C. and a family friend were abusing K.C. and R.C.; and that eventually M. COLEMAN saw the big picture that he had to kill his children to prevent them from becoming an alien species that would release carnage over the Earth.

c.    During the interview, M. COLEMAN showed the interviewing agents several hand signals or signs that M. COLEMAN said were an indication that someone was a part of the

---

[4] M. COLEMAN mentioned during the interview that "Q" was actually talking to him.

[5] "The Matrix" is a science fiction film. Neo is the lead character.

conspiracy and showing their allegiance.  M. COLEMAN then explained that he scrolled through Instagram and took screenshots of individuals making these hand signals or signs. M. COLEMAN explained that he does not use Facebook anymore, but had recently searched through his friend, A.M.'s, Facebook account and saw a posted photograph of A.M. making one of the gestures over his eye.  M. COLEMAN showed agents the hand gesture.  According to M. COLEMAN, after seeing A.M.'s posting with the hand gesture, M. COLEMAN knew that the "whole thing was a setup" and "they" were using people to get to M. COLEMAN.

       d.    During the interview, M. COLEMAN also discussed that he had seen on a politician's Twitter page a photo of the politician at an event in which there is another individual in the photo holding his finger and it was elongated and in a "spiral triangle."  M. COLEMAN thought it was "weird" and "strange" for the politician not to notice it on his Twitter home page.

       e.    M. COLEMAN identified and initialed photographs of R.C.'s and K.C.'s dead bodies as his children.

       f.    M. COLEMAN said he knew what he did was wrong, but it was the only course of action that would save the world.

       g.    M. COLEMAN signed a consent form allowing the FBI to search his iPhone and provided the passcode.

**D.  M. COLEMAN Makes Additional Statements About Twitter, Religion, and Conspiracies.**

11.  On August 10, 2021, while I was transporting M. COLEMAN to the Santa Ana jail, M. COLEMAN discussed his

religious beliefs, work as a pastor, Nephilim, and the biblical story of Abraham sacrificing his son Isaac. Also, on August 10, while SA Bannon and I were transporting M. COLEMAN to the Ventura County jail, M. COLEMAN said that about five days before he left for Mexico, he started to get clarity. M. COLEMAN said he saw messages on Instagram that were showing hand signs, proving "they" were targeting M. COLEMAN, and M. COLEMAN began to understand what those messages meant.

12.    On August 11, 2021, while I was transporting M. COLEMAN from Ventura County Jail to the United States Marshals Service, he explained that he first learned of "Lizard People" on Twitter and from "that British guy with white hair."[6]

**E.    A.C. is Interviewed at the SYPOE.**

13.    On August 9, 2021, after M. COLEMAN had entered the SYPOE without his children, FBI SA Zachary Schaefer and SA Jesse Chappell conducted a Mirandized interviewed of A.C. I reviewed the recording of that interview and observed the following:

a.    A.C. explained that she and her husband were researching QAnon, and M. COLEMAN became significantly more paranoid that people around him were involved in a conspiracy. A.C. said that M. COLEMAN started doing a lot of research on leaders running "the church" and found that they may have been

---

[6] I believe, based on my investigation of this case, "that British guy with white hair" refers to David Icke, a British conspiracy theorist with white hair, who has published several books, including "Children of the Matrix" which describes, among other things, "Nefilim," "interbreeding [] between the reptilians and the blond-haired, blue-eyed, Nordic peoples," "reptilian DNA," and "'royal' bloodlines[ of] the reptilian-Nordic hybrids," and their relation to the "Illuminati."

part of the conspiracy.  A.C. explained that M. COLEMAN began seeing "signs" in people's social media posts, and M. COLEMAN believed he was able to connect the people running "the church" to people in their community and to some of their best friends. A.C. said that M. COLEMAN found information on their friends' Instagram accounts that M. COLEMAN believed showed that they were "all in this thing together."  M. COLEMAN even accused A.C. of being a part of the conspiracy.

**F.  M. COLEMAN's and A.C.'s Communications On and About Twitter.**

14.  Pursuant to a federal warrant, I reviewed M. COLEMAN's iPhone, which had been seized at the SYPOE, and found the following:

a.  Between February 2019 and August 9, 2021, M. COLEMAN and A.C. exchanged approximately eight text messages in which they shared Twitter links.

b.  For example, on June 24, 2021, M. COLEMAN sent A.C. a series of four links from a Twitter account consisting of a memorandum regarding the next steps for a permanent lock down in the United Kingdom.

c.  As another example, on August 3, 2021, four days before M. COLEMAN took his children to Mexico, M. COLEMAN sent A.C. a link from a Twitter user in which the post reads, "TIME. TRAVEL. IS. #REAL."

d.  In addition to text messages between M. COLEMAN and A.C., M. COLEMAN also shared a number of text messages with his friend A.M. in which they shared Twitter links.

e.  For example, on June 6, 2021, M. COLEMAN sent A.M. a text message with a Twitter link to a post consisting of a video of two nationally prominent individuals embracing in a hug. According to published media reports, the individuals have expressed conspiratorial-type beliefs in the past.  The caption of the video read, "Look at these beautiful Heroes!!! LOVE THEM!!!"

f.  I also observed on M. COLEMAN's iPhone one direct Twitter message sent to another Twitter user on May 20, 2021. The message asked the other user if there were any recommendations in stocks for mid-risk retirement investing. There was no indication on the iPhone if the other user responded, but the message showed that M. COLEMAN sent direct messages through Twitter.

**G.   Interview of M. COLEMAN's Friend, A.M.**

15.  On August 20, 2021, M. COLEMAN's friend, A.M., was interviewed by SA Bannon and me.  During the interview, A.M. told us the following:

a.    M. COLEMAN started noticing "signs" everywhere, including postings on Instagram from musicians, teachers, and his friends.  M. COLEMAN took notice of symbols he saw in photographs.  Approximately three weeks before M. COLEMAN left for Mexico, M. COLEMAN started asking A.M. about these photographs and the hand gestures and symbols depicted in the photographs.  M. COLEMAN stated the people in the photographs making these signs were evil, disguised as good, therefore these people were "compromised."  A.M. also said that on August 5,

11

2021, two days prior to M. COLEMAN taking his children to
Mexico, M. COLEMAN began showing A.M. screenshots from Instagram
of A.M.'s closest friends making hand gestures such as peace
signs.  M. COLEMAN accused A.M. of being a "loyalist," which was
why A.M. could not see that he was being controlled.

> b.   Within hours of M. COLEMAN taking his children to
Mexico, A.C. called A.M., and A.M. went to the Coleman
Residence.  A.C. showed A.M. a Facebook photograph of A.M and
his friends when A.M. was approximately 13 years old (making the
photograph over 10 years old).  The photograph depicted A.M. and
his friends making hand gestures.  Based, at least in part, on
these hand gestures, A.M. said that A.C. accused him of "being
in on it" and eventually A.C. chased A.M. out of the Coleman
Residence.

**H.   Identification of SUBJECT ACCOUNT.**

16.  After M. COLEMAN's arrest, FBI personnel conducted an
open-source search through the Internet for social media
accounts associated with M. COLEMAN and located the SUBJECT
ACCOUNT.

17.  During the review of M. COLEMAN's iPhone, I discovered
that the phone had the Twitter application installed and the
username for the Twitter account was the SUBJECT ACCOUNT.

18.  On April 7, 2022, I conducted a search on the Twitter
website for the SUBJECT ACCOUNT.  The SUBJECT ACCOUNT appears to
still be an active account.  The profile page indicates that the
SUBJECT ACCOUNT joined in February 2019, has made zero "Tweets,"

is "following" 683 other Twitter accounts, and has 16
"followers."

19.   On August 12, 2021, the FBI sent a letter to Twitter
requesting it preserve the contents of the SUBJECT ACCOUNT for
90 days.  On October 29, 2021, the FBI sent a second letter to
Twitter requesting it preserve the contents of the SUBJECT
ACCOUNT for another 90 days, and on January 26, 2022, the FBI
sent a third letter to Twitter requesting it preserve the
contents of the SUBJECT ACCOUNT for another 90 days.  The third
preservation request is set to expire on about April 26, 2022.

### III.   TRAINING AND EXPERIENCE REGARDNG INDIVIDUALS WHO COMMIT VIOLENT CRIMES AND THE USE OF SOCIAL MEDIA BY THOSE WHO BELIEVE IN OR PARTICIPATE IN CONSPIRACY THEORIES.

20.   Based on my training and experience and my
discussions with other law enforcement personnel, I know that
some people who are arrested for violent crimes will feign
mental illness (i.e., engage in malingering behavior) whereas
others may suffer from legitimate mental illness.  One way to
determine if a person has a legitimate mental illness or is
malingering, or to determine the extent to which a person
understood the nature of their actions, is to examine their
conduct and communications with others in the time around and
leading up to specific events.  For that reason, besides the
content of M. COLEMAN's Twitter account potentially constituting
evidence of what caused him to kill his children and his intent,
I believe an examination of that content and any communications
through that account could help establish his true mental state

13

leading up to and around the time of the murders, as well as his mental state in relation to R.C., K.C., and A.C.

21.    Additionally, based on my training and experience and my discussions with other law enforcement personnel, I know that people who participate in and believe in conspiracy theories, such as QAnon or Illuminati, will often find like-minded individuals through online groups that are hosted on various social media platforms like Facebook, Instagram, and Twitter.  I also know, based on my training and experience and discussions with other law enforcement personnel, that individuals who participate in and believe in conspiracy theories, such as QAnon or Illuminati, will often communicate with other like-minded individuals on social media platforms such as Facebook, Instagram, and Twitter as well as through encrypted chat platforms such as WhatsApp, Signal, and Telegram.

## IV. **TRAINING AND EXPERIENCE REGARDING TWITTER**

22.  Twitter owns and operates a social networking and microblogging service of the same name that can be accessed at http://www.twitter.com and via the Twitter mobile application ("app").  Generally, Twitter allows users to register and create an account; to personalize (if desired) an account profile page; and to send and receive communications via the platform.  These functionalities are discussed in more detail below.

23.  Twitter permits its users to communicate via messages that can contain photos, videos, links, and/or a maximum of (currently) 280 characters of text.  Users can choose to share these messages, called "Tweets," with the public or,

alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers."  Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet.  Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

24.  Twitter also permits its users to exchange private messages, known as "direct messages" or "DMs," with other Twitter users.  DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s).  Direct messages may be sent to an individual user or to a group of up to 50 Twitter users. Twitter users have the ability to choose whether they can receive a direct message from anyone.  At any time, a Twitter user has the ability to alter the settings on their Twitter account so that they can receive direct messages only from (1) individuals to whom the user has already sent a direct message and (2) Twitter accounts that the user "follows" via his account.

25.  While individuals are not required to register with Twitter to view the content of unprotected Tweets, individuals must register for a Twitter account to send Tweets, to "follow" accounts in order to view protected Tweets, and to send and receive direct messages.  A user may register for an account for free by visiting Twitter's website or via the Twitter app.  When a user creates a new Twitter account, Twitter assigns that

15

account a unique user ID ("UID").  A user must also select a
password as well as a unique Twitter username (also known as a
"handle").  Twitter then appends the @ symbol in front of
whatever username the user selects to create the Twitter
username (for example: @example).  The user may also select a
different name (the "display name"), which is not automatically
preceded by the @ symbol, to be displayed on his profile picture
and at the top of his Tweets alongside his Twitter username.
The display name can include symbols similar to emojis.  The
user can change their password, username, and/or display name at
any time, but the UID for the account will remain constant.

26.  While anyone can sign up and use Twitter for free, as
of November 2021, Twitter also offered a subscription model that
offered users access to additional features and app
customizations.  This new subscription is called Twitter Blue.
A user can sign up for Twitter Blue at any time.

27.  At the time of account creation, Twitter asks the user
for certain identity and contact information, including: (1)
name; (2) email address and/or telephone number; and (3) month
and year of birth.  Twitter also keeps certain information
relating to the creation of each Twitter account, including: (1)
the date and time at which the user's account was created; and
(2) the method of account creation (e.g., website or Twitter
app).

28.  Upon the creation of a Twitter account, a generic
profile page is automatically created for the user.  This page
displays information including (1) the user's Twitter username;

16

(2) the display name; (3) the number of Twitter accounts the user is following; (4) the number of Twitter accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers").  The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page.  The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

29.  As noted above, Twitter users can use their account to send and receive communications.  If a Tweet includes a Twitter username that is preceded by the @ symbol, that is referred to as a "mention."  The Twitter user mentioned in the Tweet will receive a notification informing them that they have been mentioned and showing the content of that Tweet.  Similarly, if another Twitter user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

30.  Twitter users can also include links to webpages in their Tweets and Direct Messages.  Twitter automatically processes and shortens links provided by the user to a shortened link that starts http://t.co/.  Twitter tracks how many times these shortened links are clicked.

31.  A registered Twitter user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user.  If another user "likes" a Tweet that is posted by the Twitter user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

32.  As noted above, users can include photographs, images, and videos in their Tweets.  Each account has a "media timeline" on their profile that displays "the photos, videos, and GIF's [the accountholder] has uploaded with [their] Tweets."  An individual can view a Twitter user's media timeline by visiting the user's Twitter profile page.

33.  Twitter users can also opt to Tweet with their location attached.  This functionality is turned off by default, so Twitter users must opt-in to utilize it.  However, if a Twitter user enables Twitter to access their precise location information, the Twitter user will have the option of attaching their location (e.g., the name of a city or neighborhood) to a Tweet at the time it is sent.  If the user uses Twitter's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates.  The user can turn this functionality off (thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

34.   A Twitter user may choose to "follow" another Twitter user.  If a Twitter account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's Twitter profile page.  If a Twitter account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request.  Once an account is followed by a Twitter user, the Tweets posted by the account the user follows will appear in the user's Twitter Home timeline.  Every time a Twitter user follows another account, Twitter sends a notification to the account being followed to inform them about the new follower.  Each user's Twitter profile page includes a list of the people who are following that user and a list of people whom that user follows.  Twitter users can "unfollow" other users whom they previously followed at any time.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting based on the types of accounts that the user is already following and who those people follow.

35.   A Twitter user can also "block" other Twitter users. This prevents the blocked account from contacting or following the user or from seeing the user's Tweets.  Twitter does not notify the user of a blocked account when another Twitter account blocks them.

36.   A Twitter user can also use Twitter's integrated search function.  When a user types a search term into Twitter's

search tool, it will return results that include accounts,
Tweets, and photos that match that search term.  Twitter users
using the service via the Twitter mobile app also have the
option of saving searches that they have performed.  A user can
delete such saved searches at any time.

37.  A Twitter user can also join or create "Lists" of
other Twitter accounts.  These Lists often organize Twitter
accounts by group, topic, or interest.  Viewing a timeline of a
specific List will show you a stream of Tweets made only by
accounts that are on that List.  Users can pin their favorite
lists to their Twitter Home timeline page.  Twitter users have
the ability to remove their accounts from Lists upon which it
may appear.

38.  Twitter also offers a functionality called "Spaces,"
which it calls "a new way to have audio conversations on
Twitter."  Any user can create a Space; that user is referred to
as the "host."  Spaces are public, so anyone can join and listen
to the conversation within a Space once it is created, although
a user can send another Twitter user a link to their Space and
invite them to join.  By default, the only individuals permitted
to speak in a Space are the individuals that the host invites to
do so, although this setting can be modified to allow a broader
set of individuals to speak.  Up to 13 people can be in a Space
at a given time.

39.  Twitter also offers the ability to sign into third-
party apps and websites using one's Twitter account.  Typically,
the third-party app or website will have a link that enables the

user to sign into the third-party service using their Twitter
account.  Doing so grants the third-party service access to the
Twitter user's account.  Depending on the authorizations the
Twitter user gives to the third-party service, the third-party
service may be able to read the user's Tweets, see who the user
follows on Twitter, post Tweets to the user's profile, or access
the user's email address.  A user can revoke a third-party app
or website's authorization to access their Twitter account and
associated data at any time.

40.  Twitter collects and retains information about a
user's use of the Twitter service, to include: (1) content of
and metadata relating to Tweets and Direct Messages; (2) photos,
images, and videos that are shared via Twitter and stored in the
user's Media Timeline; (3) the identity of the accounts that a
user follows and the accounts that follow the user's account;
(4) the content uploaded to a user's profile page, including
their avatar, banner image, and bio; (5) information about
Tweets the account has liked; (6) information about Lists
associated with the account; (7) information about the Spaces
that a user has participated in, including the host of the
Space, its start and end times, and information about other
attendees; and (8) applications that are connected to the
Twitter account.  Twitter also collects and retains various
other data about a user and his/her activity, including:

      a. Logs of Internet Protocol ("IP") addresses used to
          login to Twitter and the timestamp associated with
          such logins;

b. Transactional records reflecting, for example, when a user changed their display name or email address;

c. The identities of accounts that are blocked or muted by the user; and

d. Information relating to mobile devices and/or web browsers used to access the account, including a Twitter-generated identifier called a UUID that is unique to a given device.

41. In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

42. Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their users. A user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version. Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

22

43.   A user's account activity, logs, stored electronic communications, and other data retained by Twitter can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geolocation, date and time) may be evidence of who used or controlled the account at a relevant time.  Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account.

### V.   PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

44.   Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.  The personnel of Twitter are not.  It would be inappropriate and impractical for federal agents to search the vast computer network of Twitter for the relevant account and then to analyze the contents of that account on the premises of Twitter.  The impact on Twitter's business would be disruptive and severe.

45.   Therefore, in order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Twitter, to protect the privacy of Twitter's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the FBI seeks authorization to allow Twitter to make a digital copy of the entire contents of the SUBJECT ACCOUNT.  That copy will be

provided to me or to any authorized federal agent.  The copy
will be imaged and the image will then be analyzed to identify
communications and other electronic records subject to seizure
pursuant to Attachment B.  Relevant electronic records will be
copied to separate media.  The original media will be sealed and
maintained to establish authenticity, if necessary.

46.  Analyzing the data to be provided by Twitter may
require special technical skills, equipment, and software.  It
may also be very time-consuming.  Searching by keywords, for
example, often yields many thousands of "hits," each of which
must be reviewed in its context by the examiner to determine
whether the data is within the scope of the warrant.  Merely
finding a relevant "hit" does not end the review process.
Keyword searches do not capture misspelled words, reveal the use
of coded language, or account for slang.  Keyword searches are
further limited when electronic records are in or use foreign
languages.  Certain file formats also do not lend themselves to
keyword searches.  And, as the volume of storage allotted by
service providers increases, the time it takes to properly
analyze recovered data increases dramatically.  Internet Service
Providers also do not always organize the electronic files they
provide chronologically, which makes review more time consuming
and may require the examiner to review each page or record for
responsive material.

47.  Based on the foregoing, searching the recovered data
for the information subject to seizure pursuant to this warrant
may require a range of data analysis techniques and may take

weeks or even months.  Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within 90 days of receipt of the data from the service provider, absent further application to this court.

48.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages that identify any users of the subject account(s) and any electronic messages sent or received in temporal proximity to relevant electronic messages that provide context to the relevant messages.

49.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI. **CONCLUSION**

50.  Based on the foregoing, I request that the Court issue the proposed search warrant.

51.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Twitter.  Because the warrant will be served on Twitter, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
JOSEPH P. HAMER
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on April  19 , 2022.

_____
MITCHELL D. DEMBIN
United States Magistrate Judge

26

## ATTACHMENT A

    This warrant applies to information associated with Twitter, Inc. ("Twitter") electronic communication account "@mateotaylor7" ("SUBJECT ACCOUNT") that is stored at premises owned, maintained, controlled, or operated by Twitter, a company headquartered at 1355 Market Street, Suite 900, San Francisco, California.

**ATTACHMENT B**

**I.**   Service of Warrant

The officer executing the warrant shall permit Twitter, as
custodian of the computer files described in Section II below,
to locate the files and copy them onto removable electronic
storage media and deliver the same to the officer.

**II.**   Items to be provided by the ISP

For Twitter account "@mateotaylor7" ("SUBJECT ACCOUNT"):

1) All business records and subscriber information, in any form
   kept, pertaining to the SUBJECT ACCOUNT, including:

   a) Identity and contact information (past and current),
      including full name, e-mail address, physical address, date
      of birth, phone number, gender, and other personal
      identifiers;

   b) All usernames (past and current) and the date and time each
      username was active, all associated accounts (including
      those linked by machine cookie, IP address, email address,
      or any other account or device identifier), and all records
      or other information about connections with third-party
      websites and mobile apps (whether active, expired, or
      removed);

   c) Length of service (including start date), types of services
      utilized, purchases, and means and sources of payment
      (including any credit card or bank account number) and
      billing records;

   d) Devices used to login to or access the account, including
      all device identifiers, attributes, user agent strings, and
      information about networks and connections, cookies,
      operating systems, and apps and web browsers;

   e) All advertising information, including advertising IDs, ad
      activity, and ad topic preferences;

   f) Internet Protocol ("IP") addresses used to create, login,
      and use the account, including associated dates, times, and
      port numbers, from February 2019 to August 10, 2021;

   g) Privacy and account settings, including change history; and

h) Communications between Twitter and any person regarding the account, including contacts with support services and records of actions taken;

2) All content, records, and other information relating to communications sent from or received by the SUBJECT ACCOUNT from February 2019 to August 10, 2021, including but not limited to:

a) The content of all Tweets created, drafted, favorited/liked, or retweeted by the SUBJECT ACCOUNT, and all associated multimedia, metadata, and logs;

b) The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the SUBJECT ACCOUNT, including all attachments, multimedia, header information, metadata, and logs;

3) All other content, records, and other information relating to all other interactions between the SUBJECT ACCOUNT and other Twitter users from February 2019 to August 10, 2021, including but not limited to:

a) All users the SUBJECT ACCOUNT has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the SUBJECT ACCOUNT;

b) All information from the "Connect" or "Notifications" tab for the SUBJECT ACCOUNT, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies");

c) All contacts and related sync information; and

d) All associated logs and metadata;

4) All other content, records, and other information relating to the use of the SUBJECT ACCOUNT, including but not limited to:

a) All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

b) All multimedia uploaded to, or otherwise associated with, the SUBJECT ACCOUNT;

iii

    c) All records of searches performed by the SUBJECT ACCOUNT from February 2019 to August 10, 2021;

    d) All location information, including all location data collected by any plugins, widgets, or the "Tweet With Location" service, from February 2019 to August 10, 2021; and

    e) All information about the SUBJECT ACCOUNT's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the SUBJECT ACCOUNT was clicked.

**III.** Search of the data

The search of the data supplied by Twitter pursuant to this warrant will be conducted by the FBI and any government personnel working with the FBI as provided in the "Procedures For Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of February 2019 to August 10, 2021, and to the seizure of data, communications, records, or information:

    a) tending to show M. COLEMAN's, A.C.'s, R.C.'s, or K.C.'s travel inside or outside of the United States;

    b) tending to indicate M. COLEMAN's state of mind, competency, or coherence in relation to A.C., R.C., K.C., and the SUBJECT OFFENSE;

    c) tending to indicate motive for or a plan to commit the SUBJECT OFFENSE or conceal the commission of the SUBJECT OFFENSE;

    d) tending to indicate interest in QAnon or Illuminati;

    e) about the use, purchase, or acquisition of a spear fishing gun; and

    f) tending to identify the user(s) of the SUBJECT ACCOUNT;

which is evidence of violations of Title 18, United States Code, Sections 1119 and 1111, foreign murder of U.S. nationals ("SUBJECT OFFENSE").